IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEE J. DRUMMER : | |
|     Plaintiff, : | |
| : | |
| v. : | CIVIL ACTION NO. 16-2982 |
| : | |
| HOSPITAL OF THE UNIVERSITY OF : | |
| PENNSYLVANIA : | |
|     Defendant. : | |

**MEMORANDUM OPINION**

**Rufe, J.**                                                                                                                 **April 16, 2020**

Plaintiff Lee Drummer brings claims of race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), interference and retaliation under the Family and Medical Leave Act ("FMLA"), and race discrimination pursuant to 42 U.S.C. § 1981 against Defendant Hospital of the University of Pennsylvania ("HUP"). Defendant moved for summary judgment on all of the claims, and Drummer never responded. Because Defendant has demonstrated the deficiencies in the claims, and Drummer has not presented evidence that would satisfy the elements of any of his claims, summary judgment is warranted.

**I.**     **BACKGROUND**[1]

Drummer is an African-American man who, beginning in 2000, was employed by Defendant as a Unit Secretary at HUP. Unit Secretaries support the clerical and secretarial

---

[1] Because Drummer failed to respond to Defendant's motion, these facts are drawn from Defendant's "Stipulated Statement of Material Facts" [Doc. No. 70-1], which, although apparently Plaintiff has neither agreed to nor disputed it, is supported by evidence, including the transcript of Plaintiff's deposition, the declarations, and the documentation from Plaintiff's employment file.

operation of the patient care unit. Drummer was terminated in 2006, but rehired in 2008 after filing a lawsuit against HUP and reaching a confidential settlement agreement.

Drummer's documented discipline history began on February 22, 2013 when he was reprimanded for lateness and informed that another such incident would lead to advancement in the discipline process. On September 6, 2013, Drummer received a First Written Warning for lateness for the dates of August 14, August 21, and August 28, and again was warned that another such incident would lead to further advancement in the discipline process. Drummer also acknowledged that if he failed to demonstrate improvement he might be subject to termination. Two months later, Drummer received a Second Written Warning for failing to properly take apart the chart of a discharged patient. On December 10, 2013, Assistant Nurse Manager Jenna Chrisanthon spoke to Drummer about labels not being placed on advance directives. Less than a month later, on January 3, 2014, Drummer received another Written Warning for twice failing to check and document the Secretary Hourly Checklist for Medical Records Requests Sheet. On May 15, 2014, Chrisanthon again spoke to Drummer about not taking apart the chart of a discharged patient. On June 25, 2014, Drummer was issued a Final Warning for failing to completely fill out advance directives. In December 2014, Nurse Manager Nolte and Chrisanthon talked to Drummer about his issues with lateness and warned him to be careful because he was already at a high level of discipline. One month later, in January 2015, Nolte met with Drummer regarding his failure to record new admissions' emails. Nolte told Drummer that she was talking to him because she did not want him to lose his job.

HUP issued a Performance Improvement Plan ("PIP") to Drummer on February 18, 2015, due to Drummer's failure to correct his performance. The PIP was for 30 days, contained six "competencies," and stated that "sustainment of the level of acceptable performance must be

demonstrated. Any reoccurrence of the deficiency may result in a progressive step up to and including termination."[2] Over the course of the PIP, Drummer had regular evaluations.

Drummer's February 23 evaluation showed that he did not achieve two competencies based on his failures to properly record four patient medical records upon discharge and to print a copy of discharge documents for nine discharges. On February 24, Drummer also reported late to his desk. At Drummer's February 28 evaluation, Nolte noted that Drummer did not achieve the competency of checking the Hourly Checklist for Medical Records every shift and hourly. For the March 3 evaluation, Nolte discovered records and documents that Drummer had failed to properly handle. For the March 4 evaluation, Drummer did not achieve the email capture competency as he failed to collect six new patients' email addresses.

On March 8, 2015, Nolte emailed Shannon Camps, an Employee Relations and Retention Specialist, to inform her that Drummer had been an hour and forty-six minutes late to work the prior Saturday.[3] Nolte explained that Drummer could not meet the basic standards of Unit Secretary and that she wanted to terminate him. Camps supported this decision.

On Drummer's March 16 evaluation, he achieved none of the six competencies. Specifically, "Plaintiff failed to break down a discharged patient's chart; Plaintiff failed to place doctor notes in a patient's chart; Plaintiff failed to fill out completely advance[] directive checklist for patients that arrived during his shift; Plaintiff obtained only one of six patients' e-mails admitted during his shift; Plaintiff failed to post pictures outside of patients' rooms for the nightshift prior to leaving on Sunday night; and Plaintiff failed to fax nine discharge summaries

---

[2] Defendant's Stipulated Statement of Material Facts [Doc. No. 70-1] at 8.

[3] Drummer then came into work early on Sunday and stayed late without consulting his supervisors.

that were printed out at 9:30 p.m. and left by one [of] of the fax machine[s] with no confirmation obtained."[4]

At a March 17 meeting, Nolte began reviewing with Drummer his failures on the March 16 evaluation. However, Drummer suddenly informed Nolte that he wanted to take an immediate stress leave due to some issues in his home life. Nolte and her supervisor, Betty Any Bozcar (who joined the meeting when Drummer brought up that he wanted to take a stress leave), told Drummer to take the rest of the week off and that they would finish the conversation about his performance when he returned.

Ten days later, based on Drummer's continued absence, HUP forwarded him FMLA paperwork, explained the eligibility requirements, and instructed him to return the enclosed certification form by April 13. On April 15, HUP denied Drummer's request for leave because his certification form had not been received, and directed Drummer to contact his supervisor within five days of receiving the letter. Although Drummer never contacted his supervisor, on April 27, HUP provided Drummer with another opportunity to submit the required paperwork, this time by May 5. On May 6, 2015, Drummer submitted the paperwork and was approved for FMLA leave through May 31. Drummer was informed that upon the conclusion of his leave he had to submit to his supervisor a certification from his health care provider that he was able to return to work and the date for his return. He was also told that if he could not return by May 31, he had to apply for an extension. This information was reiterated in a May 19 letter.

On June 4, after not receiving any communication from Drummer, HUP sent him another letter warning him that if he did not contact Nolte or Camps by June 8, his employment would be terminated. On June 8, Drummer contacted Camps about a transfer, but she explained that he

---

[4] *Id.* at 11; Decl. of Nicole Nolte [Doc. No. 70-2] at 6–7.

was ineligible. Camps advised Drummer to return to work on June 10. When Drummer returned on June 10, the meeting to review his performance deficiencies from his PIP resumed. At this meeting, Drummer was issued a termination letter for failing to successfully complete the PIP as of March 18, 2015.

Drummer timely filed a *pro se* suit in this Court in 2016 and requested the appointment of counsel.[5] The Court referred the case to the Attorney Panel for *Pro Se* Plaintiffs in Employment Cases[6] and the case was placed in civil suspense.[7] In early 2017, the Court removed the case from civil suspense,[8] and Drummer asked for an extension of time to obtain representation,[9] which was granted.[10] In March 2017, an attorney from the Panel was appointed,[11] and an Amended Complaint was filed.[12] Defendant filed a motion to dismiss which was granted in part and denied in part,[13] and Drummer then filed a Second Amended Complaint asserting claims of race and gender discrimination based on allegedly receiving unequal pay to similarly situated counterparts outside of his protected classes, and claims of disability discrimination and retaliation (predicated on his alleged depression and anxiety) and FMLA interference and retaliation based on his termination.[14]

---

[5] Doc. No. 4.
[6] Doc. No. 5.
[7] Doc. No. 11.
[8] Doc. No. 12.
[9] Doc. No. 13.
[10] Doc. No. 15.
[11] Doc. No. 19.
[12] Doc. No. 26.
[13] Doc. No. 32.
[14] Doc. No. 34.

Defendant filed a motion to dismiss the Second Amended Complaint, which was denied.[15] In July 2018, the proceedings were stayed for close to three months due to Drummer filing for bankruptcy.[16] In April 2019, Drummer's attorneys withdrew with the consent of the Court.[17] Drummer elected to proceed *pro se*,[18] and then requested a continuance while an attorney reviewed his case.[19] In August 2019, Drummer informed the Court that he was unable to obtain counsel and would be proceeding *pro se*.[20] The Court extended the fact discovery deadline to September 13, 2019, and the dispositive motion deadline to October 7, 2019.[21] On October 7, 2019, Defendant filed a Motion for Summary Judgment.[22] Drummer never responded.

## II. STANDARD OF REVIEW

"The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[23] A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[24] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[25] A dispute is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving

---

[15] Doc. No. 40.

[16] Doc. No. 48, 50, 52 & 53.

[17] Doc. No. 59.

[18] Doc. No. 62.

[19] Doc. No. 64.

[20] Doc. No. 68.

[21] Doc. No. 69.

[22] Doc. No. 70.

[23] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[24] Fed. R. Civ. P. 56(a).

[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

6

party."[26]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[27] Further, a court may not weigh the evidence or make credibility determinations.[28] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[29] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[30] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[31]

"When a summary judgment motion is uncontested, the non-responding party does not lose the summary judgment motion by default."[32] "By failing to respond, however, 'the nonmoving party waives the right to respond to or to controvert the facts asserted in the summary judgment motion.'"[33] Where, as here, the moving party does not bear the burden of proof on the relevant issues, the district court must determine whether deficiencies in the nonmoving party's "evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law."[34]

---

[26] *Id.*

[27] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[28] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1988).

[29] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[30] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[31] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[32] *Hitchens v. Cty. of Montgomery*, 98 F. App'x 106, 110 (3d Cir. 2004); *see also Nunez v. Heere*, No. 18-4493, 2020 WL 587021, at *2 (E.D. Pa. Feb. 6, 2020).

[33] *B&B Fin. Servs. LLC v. Kallock*, No. 05-1277, 2006 WL 2869529, at *1 (E.D. Pa. Oct. 4, 2006) (quoting *Reynolds v. Rick's Mushroom Serv.*, 246 F.Supp.2d 449, 453 (E.D. Pa. 2003)).

[34] *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (citation omitted).

### III.  DISCUSSION

Although Drummer bears the burden of proof on his claims, Drummer has presented no evidence to satisfy the elements of his claims. Drummer's allegations in his Second Amended Complaint are entitled no weight on summary judgment because "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[35] Defendant therefore has produced uncontroverted evidence that entitles it to judgment as a matter of law.

#### A. Title VII & 42 U.S.C. § 1981 Race and Gender Discrimination Claims

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to compensation or terms, conditions, or privileges of employment on the basis of race or gender."[36] "Section 1981 requires both private and state entities to grant '[a]ll persons' the same rights as are 'enjoyed by white citizens.'"[37] Drummer's Title VII gender discrimination claim is based on his allegation that he was paid less than female Unit Secretaries, and his Title VII and § 1981 race discrimination claims are based on his allegation that non-African-American Unit Secretaries were paid more than him. Because "[r]ace and gender-based discrimination claims brought under Title VII and race-based claims brought under § 1981 are all analyzed under the same burden-shifting scheme," the Court will consider these claims together.[38]

---

[35] *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985)); *see also Hawkins v. Fed. Nat. Mortg. Ass'n*, No. 2:13-6068, 2015 WL 356932, at *2 (E.D. Pa. Jan. 28, 2015).

[36] *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 588 (E.D. Pa.) (citing 42 U.S.C. § 2000e–2(a)), *aff'd*, 708 F. App'x 48 (3d Cir. 2017).

[37] *Id.* (quoting 42 U.S.C. § 1981(a), (c)).

[38] *Id.* (citing *Greer v. Mondelez Global, Inc.*, 590 F. App'x. 170, 172 n.4 (3d Cir. 2014)). The Supreme Court recently held that a plaintiff asserting a claim under § 1981 must demonstrate that the injury would not have

In the absence of direct evidence of discrimination, a prima facie case of employment discrimination requires a plaintiff to demonstrate by a preponderance of the evidence that: "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he sought to retain; (3) the plaintiff suffered an adverse employment action, e.g. termination of his employment; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination."[39] "To establish the fourth element, a plaintiff may either: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action."[40]

In his deposition, Drummer was asked, "Sir, are your concerns with respect to your pay dating back to the returning to work in 2008 and believing that you were not paid under that confidential agreement?"[41] Drummer responded "yes."[42] After Drummer was then asked: "Would you agree then that your concerns with respect to your pay have nothing to do with gender," Drummer conceded that "[a]s far as the pay, uhm, yes."[43]

Drummer's unequal pay on the basis of race was apparently based on a comparison to "Michael"—a Caucasian Unit Secretary.[44] Drummer, however, did not know Michael's last

---

occurred "but for" the defendant's unlawful conduct. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020).

[39] *Green v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

[40] *Id.* (citing *Sarullo*, 352 F.3d at 797 n.7).

[41] Drummer Dep. at 258:4-9.

[42] *Id.* at 258:10.

[43] *Id.* at 258:11-14.

[44] *Id.* at 260:3-16.

name, how long he had been employed, whether Michael "was at a higher level position" than he was and, most importantly, whether Michael was "paid more or less" than he was.[45] Moreover, Drummer testified that he had no reason to believe that if Michael earned a higher salary, "that this difference . . . was based on race."[46] In fact, Drummer's claim appeared to be entirely based on the fact that Michael "wore a suit a lot of times" before the Unit Secretaries "transferred to suit and tie" and "he [talked] directly with the doctors to help them with the medical records, outside records"—evidence indicating that Michael and Drummer had different roles.[47] Therefore, because on the basis of the unchallenged evidence Drummer cannot make out a prima facie case, summary judgment will be granted on the Title VII and § 1981 claims.

### B. FMLA Interference Claim

"To make a claim of interference under the FMLA, a plaintiff must establish: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA."[48]

As Defendant argues, Drummer cannot establish a FMLA interference claim because it is undisputed that Drummer received the benefits to which he was entitled. Drummer testified that "Penn approved [his] FMLA request," that he "continued to receive [his] benefits during that

---

[45] *See id.* at 260:12-262:9.

[46] *Id.* at 264:3-13.

[47] *Id.* at 261:11-23.

[48] *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (quoting *Johnson v. Cmty. Coll. of Allegheny Cty.*, 566 F.Supp.2d 405, 446 (W.D. Pa. 2008)).

10

leave," and that he was "reinstated" at the conclusion of his leave.[49] Therefore, summary judgment will also be granted on the FMLA interference claim.[50]

### C. ADA Discrimination and Retaliation Claims and FMLA Retaliation Claim

"In order to make out a prima facie [discrimination] case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability."[51] To make out an ADA or FMLA retaliation claim, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[52] Because all three of these claims hinge on Defendant's basis for terminating Drummer—whether it was related to his alleged depression and anxiety and whether it was retaliation for taking FMLA leave—the Court will evaluate the claims together.

"The familiar *McDonnell Douglas* framework" requires a plaintiff to first establish a prima facie case.[53] "If the plaintiff successfully demonstrates a prima facie case of discrimination

---

[49] *See* Drummer Dep. at 304:9-305:9; Decl. of Shannon Camps [Doc. No. 70-3] at 3–4. Moreover, "the FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007) (citing 29 U.S.C. § 2614(a)(3)(B)).

[50] *See Ross*, 755 F.3d at 192 ("Because Ross received all of the benefits to which he was entitled by taking leave and then being reinstated to the same position from which he left, and thus cannot satisfy the fifth prong of the interference analysis, he fails to make a prima facie showing of interference.").

[51] *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998) (quoting *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

[52] *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002) (citing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)); *Ross*, 755 F.3d at 193 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)) ("To succeed on an FMLA retaliation claim, a plaintiff must show that "(1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights.").

[53] *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 433 (W.D. Pa. 2009) (FMLA); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (ADA); *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 653 (W.D. Pa. 2018) ("As with discrimination claims, retaliation claims under the ADA are analyzed under the *McDonnell Douglas* framework.") (citing *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)).

[or retaliation], the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision."[54] A defendant "answers its relatively light burden" of production by "introducing evidence which, taken as true, would permit the conclusion that there was a [legitimate] reason for the unfavorable employment decision."[55]

"Once the defendant has satisfied its burden of production at the second stage of the *McDonnell Douglas* tripartite framework, a court's analysis turns to the third and final aspect of the inquiry."[56] "At this point, the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext."[57] "[A] plaintiff may defeat a motion for summary judgment . . . by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"[58] "[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or

---

[54] *Id.* (citing *Simpson v. Kay Jewelers Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998)).

[55] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2748 (1993)).

[56] *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 412 (3d Cir. 1999).

[57] *Id.*

[58] *Id.* at 413 (quoting *Fuentes*, 32 F.3d at 764; *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)).

otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."[59]

The Court "will assume for the sake of argument that [Drummer] has established a prima facie case."[60] Defendant's evidence that Drummer's "termination had nothing to do with his taking leave under the FMLA or any alleged disability"[61] that Nurse Nolte was unaware of Drummer's alleged disabilities when she made the decision to terminate him, and that "the reason for Plaintiff's termination was his failure to successfully complete the PIP,"[62] satisf[ies] Defendant['s] burden of production."[63] "Therefore, the burden returns to [Drummer]" who has not come forth with any evidence to show that Defendant's reason was pretextual.[64] Summary judgment will be granted on these claims.

### IV. CONCLUSION

By failing to support any of his pleading allegations with evidence, Drummer has not established the existence of a genuine issue of material fact for trial. Accordingly, the Motion will be granted. An order will be entered.

---

[59] *Fuentes*, 32 F.3d at 764 (citations omitted); *see also Newell v. Heritage Senior Living, LLC*, 673 F. App'x 227, 231 (3d Cir. 2016).

[60] *Newell*, 673 F. App'x at 231. In the portions of Drummer's deposition that Defendant has included, Drummer testified both that "retaliation was part of" the decision to terminate him after he invoked his right to FMLA leave, Drummer Dep. at 305:10-16, and that he was discharged from his employment because of his depression and anxiety. *See id.* at 278:9-17.

[61] Decl. of Nicole Nolte [Doc. No. 70-2] at 8. In fact, rather than proceed with terminating Drummer, the record reflects that once Drummer informed Nurse Nolte about his depression and anxiety, he was given a leave of absence and his termination was postponed. *See* Drummer Dep. at 279:11-21; Decl. of Nicole Nolte [Doc. No. 70-2] at 7.

[62] *Id.* at 7–8.

[63] *Newell*, 673 F. App'x at 231. To the extent that Drummer's ADA discrimination claim is based on his request for a transfer, Defendant has produced evidence that Drummer was not eligible for a transfer based on his discipline history, *see* Drummer Dep. at 242:15-243:17, and Drummer has not presented any evidence that this reason for refusing the transfer was a pretext.

[64] *Id.*